# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                     )

**MARK FLAHERTY,**                   )        **Civil Action No.**

                                     )        **16-11667-FDS**

          **Plaintiff,**            )

                                     )

         **v.**                      )

                                     )

**ENTERGY NUCLEAR OPERATIONS, INC.,**  )

                                     )

          **Defendant.**          )
_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION TO STRIKE AND MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

      This is a claim of disability discrimination brought by a nuclear-power station security guard. In 2004, plaintiff Mark Flaherty began working for defendant Entergy Nuclear Operations, Inc., as a guard at its Pilgrim Nuclear Power Station in Plymouth, Massachusetts. Since at least 2012, he has suffered from post-traumatic stress disorder ("PTSD"), chronic fatigue syndrome ("CFS"), and a variety of other conditions.

      The Nuclear Regulatory Commission requires Entergy to perform comprehensive ongoing assessments of its guards to ensure that they are "trustworthy and reliable" and capable of performing the work. That work requires, among other things, constant alertness and the carrying of firearms. As a part of that process, Flaherty was required to report annually on his medical and psychological condition.

      In February 2015, Flaherty was asked to work mandatory overtime as required under a collective bargaining agreement. He refused, citing fatigue. That precipitated an inquiry by Entergy into his medical history. Entergy discovered that Flaherty had been diagnosed with

PTSD and CFS and had been receiving disability benefits for those conditions from the Department of Veterans Affairs since 2013. In the interim, Flaherty had submitted multiple annual medical questionnaires to Entergy that failed to disclose either condition.

After concluding that he had improperly failed to disclose his medical history, Entergy stripped him of his security clearance. Without proper clearance, Flaherty could no longer work as a security guard and was terminated from his employment.

Flaherty then filed a complaint asserting claims for disability discrimination and failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and the Massachusetts Antidiscrimination Statute, Mass. Gen. Laws ch. 151B.

As to his principal claim, Flaherty contends, in substance, that it was permissible to give false answers on his medical questionnaire and to conceal his conditions, if he and his health-care providers thought the conditions would not affect his ability to work. Put another way, Flaherty contends that it was up to him, not Entergy or the Nuclear Regulatory Commission ("NRC"), to decide what to disclose to his employer about his mental health, and when. That, of course, is not true, and Entergy was within its rights to terminate his employment when they discovered his false statements.

Flaherty also contends that he took leave under the Family and Medical Leave Act in May 2014, that he disclosed his conditions to the company at that time, and the company allowed him to continue working. There is evidence that Flaherty's psychologist revealed the existence of his PTSD to someone at the Entergy human resources department (although not Flaherty's supervisors) at that time. There is no admissible evidence, however, that Flaherty ever disclosed his CFS in connection with that leave.

In short, it is undisputed (1) Flaherty suffers from PTSD and CFS, (2) he lied about those

conditions on his annual medical questionnaires, and (3) at a minimum, he did not disclose his CFS at any point prior to April 2015, immediately before his termination. Entergy terminated him based on his failure to provide truthful information. Flaherty has not produced sufficient evidence to show that the stated reason was a pretext, and accordingly summary judgment will be granted as to his claim arising out his termination.

Flaherty's claim for lack of accommodation fares no better. It is perhaps obvious that PTSD and CFS, taken together, are not ideal qualities for a security officer who carries a firearm and guards a nuclear facility, and it is far from clear whether any accommodation of those conditions could ever be made. Flaherty admits that he did not ask for an accommodation until April 26, 2015, the day he was suspended for failing to report his conditions. Even then, the only accommodation he claimed was to work fewer overtime hours. And, in any event, he failed to raise a lack of accommodation claim before the MCAD. Having failed to exhaust those claims at the agency level, he is barred from raising them in federal court.

In his opposition to the motion for summary judgment, Flaherty submitted an affidavit that contradicts his sworn deposition testimony in a variety of ways. Entergy has moved to strike portions of the affidavit, including a key statement that directly contradicts his deposition testimony. That motion will be granted in part and denied in part.

I.  **Background**

Unless otherwise noted, the following facts are as set forth in the record and are undisputed.

A.  **Factual Background**

1.  **Regulatory and Operational Background**

Entergy Nuclear Operations, Inc., operates the Pilgrim Nuclear Power Station in

Plymouth, Massachusetts. (Colburn Decl. ¶ 4). As part of its security operations, Entergy

maintains an armed security force. (*Id.* ¶ 6). The "primary function" of the nuclear security

officers is "to protect the health and safety of the public from radiological sabotage." (Beabout

Dep. at 13).

The NRC requires all nuclear power plants to maintain an "access authorization

program." 10 C.F.R. § 73.56. Pursuant to NRC regulations, all security personnel are required

to have "Unescorted Access Authorization" in order to access sensitive areas in the plant, such as

nuclear reactors. (*Id.*).

The NRC requires an extensive background investigation to obtain unescorted access

authorization, including assessments of personal history, employment history, credit history,

character and reputation, and criminal history, as well as a psychological assessment and

behavioral observation. (*Id.*). The regulations also require ongoing annual assessments for those

granted such access. (*Id.*). In the words of the NRC, the "general performance objective" of

such an access authorization program is to "provide high assurance" that the individuals in

question "are trustworthy and reliable, such that they do not constitute an unreasonable risk to

public health and safety or the common defense and security, including the potential to commit

radiological sabotage." 10 C.F.R. § 73.56(c)

As to medical and mental health issues, NRC Regulatory Guide 5.75 (Training and

Qualification of Security Personnel at Nuclear Power Reactor Facilities) states the following,

under § 2.5 (Existing Medical Conditions):

> [I]ndividuals should not have an established medical history or medical diagnosis
> of existing medical conditions that could interfere with or prevent the individual
> from effectively performing assigned duties and responsibilities. If a medical
> condition exists, the individual must provide medical evidence that the condition
> can be controlled with medical treatment in a manner that does not adversely
> affect the individual's fitness-for-duty, mental alertness, physical condition, or

capability to otherwise effectively perform assigned duties and responsivities. (Colburn Decl. Ex. A at 12). In addition, 10 C.F.R. § 73, App. B(I)(B)(2)(b) requires that "[a]rmed individuals" should "have no emotional instability that would interfere with the effective performance of assigned security job duties."

Entergy's medical program, incorporating those regulations, requires that its security personnel be "medically fit to perform guard, armed response, armed escort and alarm station operator activities" and "perform strenuous physical activity while carrying security equipment including firearms and other protective equipment." (Colburn Decl. Ex. D at 2). Entergy security officers are subject to annual medical and physical assessments to ensure that they are qualified for the necessary Unescorted Access Authorization. (Colburn Decl. ¶ 10). As part of that process, each officer is required each year to answer a personal and medical history questionnaire.

### 2. Flaherty's Employment at Pilgrim

Mark Flaherty served in the Marine Corps from 1993 to 1997 and from 2000 to 2004. (Keith Decl. Ex. 2 at 105). While serving in the Marines, he saw combat in Iraq. (Flaherty Aff. ¶ 7).

Flaherty was hired as a Nuclear Security Officer at the Pilgrim station in June 2005. (Flaherty Dep. at 2). At the time, he was employed by a private security company named Wackenhut. (*Id.*). On January 1, 2007, he began directly working directly for Entergy. (Keith Decl. Ex. 2 at 77). The security team was overseen by Richard Daly, the security superintendent, and Phil Beabout, a security manager. (Colburn Decl. ¶ 22; Beabout Dep. at 7).

### 3. Flaherty's Medical and Mental Health History

On July 5, 2012, Flaherty filed a claim for service-connected disability benefits with the

Department of Veterans Affairs ("VA"). (Keith Decl. Ex. 2 at 105-11). He claimed service-connected disability based on CFS, PTSD, radiculopathy, chronic diarrhea, and lumbar strain. (*Id.* at 105-06).[1]

On July 9, 2013, Flaherty was examined at a VA medical center. (*Id.* at 187). According to VA records, he reported disability based on stomach and duodenal conditions, back and neck problems, joint pain, PTSD, fatigue, and sleep disturbances. (*Id.* at 189-93).[2]

On October 10, 2013, Flaherty completed a "Chronic Fatigue Syndrome Disability Benefits Questionnaire" at a VA medical center. (*Id.* at 180-84). Among other things, he reported that his CFS symptoms "began mid 2009 and have continued and worsened since." (*Id.* at 180). He reported that his symptoms included "poor attention," "inability to concentrate," and "forgetfulness," and that those symptoms were "nearly constant." (*Id.* at 182).

On October 22, 2013, the VA granted Flaherty's application for disability benefits. It concluded that he had CFS (40 percent disability), PTSD (30 percent disability), radiculopathy (10 percent disability), chronic diarrhea (10 percent disability), and lumbar strain (10 percent disability). (*Id.* at 147-53).[3] On October 29, 2013, he was awarded monthly benefits retroactive to August 1, 2012. (*Id.* at 143).

On May 23, 2014, Flaherty was seen again at the VA medical center, complaining of chronic pain and fatigue. (*Id.* at 177). At a follow-up appointment on June 3, 2014, the attendant physician noted that he suffered from PTSD, dyslipidemia, back pain, headaches,

---

[1] The actual application, which was on VA Form 21-526, is not in the record. (*See* Keith Decl. Ex. 2 at 106).

[2] On September 12, 2013, Flaherty was again examined at a VA medical center. (*Id.* at 142, 187).

[3] In his deposition, Flaherty stated that the first time he was formally diagnosed with PTSD and CFS was "the middle of 2012," when he first filed a disability claim with the VA. (Flaherty Dep. at 98). However, in his most recent affidavit, he stated that he did not receive those diagnoses until November 2013, when the VA granted his disability claim. (Flaherty Aff. ¶¶ 21-22; Keith Decl. Ex. 2 at 105).

chronic fatigue, irritable bowel syndrome, sciatic nerve paralysis, and lumbosacral/cervical strain.  (*Id.* at 175).  He was taking acetaminophen and Etodolac (a non-steroidal anti-inflammatory drug) for pain, Prazosin (a drug used to treat anxiety and PTSD), and Sertraline (a drug used to treat depression, anxiety, and PTSD).  (*Id.* at 176).  He was seen on multiple occasions by VA physicians between May 12 and July 18, 2014.  (*Id.* at 163, 166, 177, 178, 179).

On April 24, 2015, Flaherty was seen again at the VA medical center.  (*Id.* at 161-62).  On May 1, 2015, at a follow-up physical therapy appointment, he complained of increased back pain.  He also indicated that he had a history of alcohol abuse, depressive disorder, dyslipidemia, PTSD, and chronic low-back pain.  (*Id.* at 160).  He was seen again four days later for medication management and individual therapy.  (*Id.* at 157).  Among other things, he was taking acetaminophen, Etodolac, Prazosin, Bupropion (an anti-depressant), and cyclobenzaprine (a muscle relaxant).  (*Id.* at 159).

At some point, Flaherty claimed an increase in his disability due to, among other things, CFS and PTSD.  On March 17, 2016, the VA granted his application, rating him 60% disabled due to CFS and 50% disabled due to PTSD.  (*Id.* at 132-35).

On January 12, 2017, he filed another claim for an increase, claiming 100% disability based on PTSD.  (*Id.* at 126).  That application was granted by the VA on March 23, 2017.  (*Id.*).  As of February 2017, he was receiving $3,545.04 in benefits each month.  (*Id.* at 118).

### 4.    Flaherty's 2012 and 2013 Medical History Questionnaires

On July 26, 2012, Flaherty filled out his annual medical history questionnaire for Entergy.  He filled out that questionnaire only three weeks after he filed the application with the VA for disability benefits for a variety of conditions, including CFS, PTSD, diarrhea, and lumbar

strain.

The questionnaire asked, "Do you have or have you ever had any of the following," and listed a variety of conditions or symptoms. Flaherty marked the "no" boxes for the following conditions: "depression or anxiety treatment"; "frequent diarrhea"; and "back trouble, injury, pain." (Keith Decl. Ex. 2 at 19-20). He only marked the "yes" box for weekly coffee consumption. (*Id.* at 20). He did not list any medical conditions or medications. (*Id.* at 19-20). He also did not disclose any conditions to the evaluating physician.[4]

On his August 8, 2013 annual medical history questionnaire, Flaherty marked the "no" boxes for "depression/anxiety/other psychological disorder"; "frequent diarrhea"; and "back trouble, injury, pain." (*Id.* at 21-22). The form had changed from the prior year, and now included a specific question concerning "Post-Traumatic Stress Disorder." (*Id.*). Flaherty marked the "no" box. (*Id.*). He did not list any medical conditions or medications. (*Id.* at 21). Again, he did not disclose any conditions to the evaluating physician.[5]

As noted, on October 22, 2013, the VA granted Flaherty's application for disability benefits.

### 5.   Flaherty's Application for FMLA Leave

On May 15, 2014, Flaherty applied to Entergy for short-term leave under the Family and Medical Leave Act ("FMLA") for the period from May 11 to July 15, 2014. (Pl. Ex. 4 at 2, 5). His application for leave was sent to the "Entergy Leave Team," which apparently was composed of human resources representatives. (*Id.* at 4). In his application, he checked a box

---

[4] At the end of the questionnaire in the physician summary section, there are handwritten notes stating: "40 [year old male]. [Patient medical history]: (1) 5/12 vasectomy no complication; (2) occas[ional] low[er] back pain; [unintelligible] military injuries. No recent flare-ups, no current [treatment]." (*Id.* at 20). There is no mention of CFS or PTSD.

[5] In the physician summary section, there are handwritten notes stating: "[Patient history]: occas[ional], tolerable back pain (chronic); [surgery]—none. [Family history]—[unintelligible]." (*Id.* at 22).

8

stating that he was "unable to perform the essential functions of my job, with or without reasonable accommodation, for more than forty (40) consecutive work hours due to a physical or mental impairment or condition." (*Id.* at 7).

The application for FMLA leave did not include any specific statement by Flaherty as to the claimed basis for the leave. However, the application included a handwritten note from a clinical psychologist at the VA named Julie Klunk-Gillis. (*Id.* at 10). The note from Klunk-Gillis stated as follows:

> Veteran stating that he is struggling with daily anxiety, depressive symptoms, and insomnia. He is diagnosed with PTSD and Prolonged Depressive Disorder. Veteran would benefit from individual + group therapy as well as psychiatry to address his symptoms. Prognosis is good with consistent treatment. Veteran denies any risk to self or others currently or in the past.

(*Id.*). Neither Flaherty nor Klunk-Gillis made reference of any kind to CFS in the application for leave.

Flaherty was granted leave on May 16, 2014. (*Id.* at 14). On July 3, 2014, after approximately a month and a half, Flaherty returned to work. (Pl. Ex. 5).

Prior to his return, Flaherty was cleared for work by Klunk-Gillis and a nurse practitioner, Sheila Shea, from Cape and Islands Occupational Medicine ("CIOM") in Hyannis, Massachusetts. (*Id.* at 3, 5). The only evidence in the record as to that clearance are the forms filled out by the two providers. Again, neither form contains any reference to CFS.

There is no evidence that any of his direct supervisors were told at the time of Flaherty's leave that he suffered from either PTSD or CFS.

### 6.   Flaherty's 2014 Medical History Questionnaire

On his July 30, 2014 annual medical history questionnaire, Flaherty again marked the "no" boxes for "depression/anxiety/other psychological disorder"; "Post-Traumatic Stress

Disorder"; "frequent diarrhea"; and "back trouble, injury, pain." (Keith Decl. Ex. 2 at 23-24).

At that time, he was receiving disability benefits for those very conditions. He marked "yes"

boxes indicating that he previously smoked but quit in May 2010; had hives, eczema, or a rash;

and consumed coffee and beer on a weekly basis. (*Id.*). He did not list any other medical

conditions or medications. (*Id.*). Again, he did not disclose any conditions to the evaluating

physician.[6]

### 7.     Flaherty's Rationale for Providing False Answers

As noted, Flaherty did not disclose the diagnoses of CFS and PTSD on the medical

questionnaires for 2012, 2013, and 2014. He also failed disclose other medical issues, such as

his diarrhea and back pain issues.

Flaherty does not dispute that his answers to the questionnaires were false. In the

affidavit he submitted in opposition to the motion for summary judgment, Flaherty states that he

discussed his CFS and PTSD with his "medical providers" (apparently, his providers at the VA)

in late 2013 or early 2014. (Flaherty Aff. ¶ 23). His affidavit further states as follows:

> My medical providers were of the opinion that the CFS and PTSD conditions and
> symptoms, with treatment, in my case, would not interfere with my work duties at
> Pilgrim.
>
> My medical providers recommended to me that I not volunteer my diagnoses to
> my employer without good reason; they advised me that my privacy rights as a
> disabled veteran dictated that I was within my rights to refrain from such a
> volunteered disclosure unless the condition affected my ability to perform my
> duties in any way.
>
> At the time, I also conducted my own research by reviewing EEOC guidelines
> relative to military veterans and service connected disabilities such as PTSD.
>
> Between my own research and my medical providers['] advice, I concluded that
> unless my symptoms of CFS and PTSD were interfering with work, I was not

---

[6] In the physician summary section, there are handwritten notes stating:  "[Patient history]:  occas[ional] / chronic back ache (no [change]); [surgery]—none.  [Family]—[unintelligible]." (*Id.* at 24).

required to disclose these symptoms to my supervisors at Entergy.

(*Id.* ¶¶ 24-27); *see also id.* ¶ 41 ("I did not disclose my CFS or PTSD diagnoses on the July 30,

2014 Medical Questionnaire because a) as of that time, Entergy's medical examiner, my VA

medical providers and I had all determined that these conditions were not interfering with my

ability to perform the duties of my position; and b) I understood from both my VA medical

providers and from Entergy's human resources representative that the specific diagnoses were

sufficiently private that my supervisors need not be privy to them.").[7]

Flaherty also admits that he did not tell his supervisors at Entergy about his conditions.

His rationale, as set forth in his affidavit, is as follows:

> I in fact did not tell my supervisors at Entergy about my PTSD or CFS diagnoses
> until April 29, 2015 because I considered these private, and because Entergy's
> Human Resources department, my own medical providers as well as my own
> research about my legal rights had led me to conclude that I need not discuss
> these conditions with my direct supervisors.

(*Id.* ¶ 95).

### 8.     Flaherty's Refusal to Work Mandatory Overtime

Flaherty was a member of the United Government Security Officers of America

("UGSOA") union. (Flaherty Dep. at 12). The terms and conditions of his employment were

governed by a collective bargaining agreement ("CBA") negotiated between Entergy and the

union. (*Id.* at 34). Article 30.02 of the CBA, titled "Training, Testing and Qualifications," states

that "[e]mployees must have the required access authorization level associated with their job title

as a condition of continued employment." (Keith Decl. Ex. 2 at 66). Article 7.08 of the CBA,

---

[7] All three questionnaires were signed by Flaherty and included the following acknowledgement: "I agree to self-report any changes in my medical condition that could affect my ability to perform my job or my respiratory qualification." (*Id.* at 19-24). That self-reporting obligation was of course intended to apply to future changes, not then-existing medical conditions. Furthermore, Flaherty was required to self-report any change that "*could* affect" his ability to perform the job, not just changes that *did* affect that ability. There is not the slightest question that PTSD and CFS *could* affect the ability of a nuclear security guard to perform his job.

which contains overtime provisions, states that "the Company reserves the right to mandate overtime by requiring the employee with the least amount of overtime hours worked." (*Id.* at 39).

On February 14, 2015, Flaherty refused to work mandatory overtime scheduled for February 17, three days later. (Keith Decl. Ex. 2 at 87). He told his supervisors that he was too fatigued to work overtime. (Beabout Dep. at 14-15).

### 9. Entergy's Investigation of Flaherty's Medical Conditions

Flaherty's supervisor, Phil Beabout, expressed surprise and concern that he was claiming prospective fatigue, three days in advance. (*Id.* at 17). Entergy then conducted an investigation beginning on February 28, 2015. (Keith Decl. Ex. 2 at 80).

On March 25, 2015, Flaherty was interviewed by George Peters, a psychologist with a company called The Stress Center. (Pl. Ex. 6). The interview was apparently part of a five-year evaluation of Flaherty for continued Unescorted Access Authorization. (Pl. Ex. 6; Flaherty Aff. ¶ 57). A one-page form signed by Glenn Cantieletti of The Stress Center stated that Flaherty was "mentally alert and coherent and without gross aberrant behavior" and found him "acceptable" for such access. The form indicated, however, that no "background information was received and considered in this decision." (Pl. Ex. 6). Flaherty contends that during the evaluation, he "fully disclosed [his] military combat history" and "CFS and PTSD diagnoses and symptoms" to Peters. (Flaherty Aff. ¶ 58).

On March 31, 2015, Paul Tetreault, a Security Operations Supervisor at Entergy, executed a "Fact Finding Summary and Just Cause Evaluation Form." (Keith Decl. Ex. 2 at 80-81). The form indicated that Flaherty had refused mandatory overtime; it also noted that he had received at least ten written warnings or "coachings" since 2011 for refusing overtime. (*Id.* at

81).  A "consensus meeting" of four supervisors, including Beabout, recommended that Flaherty

receive a three-day suspension.  (*Id.*).

A formal notice of discipline was issued on April 23, 2015, suspending Flaherty for three

days (April 26-28).  (*Id.* at 87).

### 10.  Flaherty's Call to the Ethics Hotline

On April 24, 2015, Flaherty called Entergy's ethics hotline to make a complaint about his

suspension.  (*Id.* at 89).  A case detail report summarizing the call was prepared by an Entergy

human resources investigator.  (*Id.*).  Among other things, the report states as follows:

> Mark [Flaherty] is a disabled veteran who suffers from chronic fatigue syndrome.
> Richard [Daly] and Phil [Beabout] [Flaherty's supervisors] currently are unaware
> of Mark's medical condition, and Mark plans to present them with documentation
> of his medical condition from Mark's doctor.

(*Id.*).

That disclosure was forwarded to the Access Authorization department at Entergy, which

was overseen by Stephanie Colburn.  On April 28, 2015, Entergy temporarily suspended

Flaherty's access pending further investigation.  (Keith Decl. Ex. 2 at 201; Colburn Aff. ¶ 21).

### 11.  Flaherty's Termination

On April 29, 2015, Flaherty provided his VA medical records to Daly, who forwarded

them to the Access Authorization department.  (Flaherty Dep. at 46-47; Colburn Aff. ¶¶ 22-23).

The Access Authorization department reviewed those records and his annual medical

questionnaires, and determined that Flaherty had failed to disclose his CFS on those forms.

(Colburn Aff. ¶¶ 23-25).

Flaherty was then given a medical examination by Dr. Kenneth Boyd and a psychiatric

evaluation by Dr. Laurence Baker.  (*Id.* at ¶ 25).  Both determined that Flaherty had willfully

withheld medical information.  (*Id.*).

Dr. Boyd's report is dated May 1, 2015. (*Id*. Ex. L). He found that Flaherty had "not been forthcoming about his previous and ongoing medical diagnoses" during his annual medical examinations and "did not notify the medical department of important medical conditions that needed to be considered in evaluating him for his ability to adequately and safely perform security officer duties in a timely manner." (*Id.*). He concluded that "Mark does not meet the criteria needed to work as a security officer." (*Id.*).

Dr. Baker's report is dated May 11, 2015. (*Id.* Ex. M). He found that Flaherty had "consciously withheld health information" when he was first hired and that his conditions "clearly should have been" disclosed, at a minimum, in his subsequent medical examinations. (*Id.* at 5). He noted that Flaherty "wants to be considered both 70% disabled (according to the VA), and 100% able to do the job." (*Id.*). He also conducted the "Minnesota Multiphasic Personality Inventory—2" test and concluded that Flaherty was highly defensive and suffered from depression and anxiety. (*Id.*). Dr. Baker ultimately concluded that Flaherty "does not appear to be acceptable for unescorted access in a nuclear facility, or to be qualified to be employed as a security officer in such a setting." (*Id.* at 6).

Based on that information, the Access Authorization group at Entergy concluded that Flaherty did not satisfy the requirements of "trustworthiness and reliability" to maintain his Unescorted Access Authorization. (*Id.* Ex. N). Accordingly, on May 12, 2015, Entergy denied Flaherty Unescorted Access Authorization for a period of five years. (*Id.*).

Without that authorization, Flaherty could no longer work as a security officer. Accordingly, he was terminated from his position on May 19, 2015. (*Id.* Ex. O). Two other security officers had also been terminated over the previous three years for failing to disclose relevant information. (*Id.* Exs. F, G).

**B.      Procedural Background**

Flaherty filed a charge with the Massachusetts Commission Against Discrimination on May 26, 2015.  (Keith Decl. Ex. 2 at 90-104).  The charge alleged that Entergy discriminated against him on the basis of disability.  (*Id.* at 103).  It did not include a claim for failure to accommodate.  (*Id.* at 102-03).  On November 25, 2015, he withdrew the MCAD complaint to file suit in federal court.  (*Id.* at 97).

Flaherty filed this suit on August 16, 2016.  The complaint alleges disability discrimination and failure to accommodate in violation of the ADA (Count 1) and the Massachusetts Antidiscrimination Statute, Mass. Gen. Laws ch. 151B (Count 2).  After discovery, Entergy moved for summary judgment and to strike portions of Flaherty's affidavit because, among other reasons, it contained hearsay and testimony directly contradicting earlier sworn statements.

**II.      Analysis – Motion to Strike**

Counsel for Entergy took Flaherty's deposition on September 11, 2017.  Based in part on his responses to those questions, Entergy then moved for summary judgment as to all claims.

When he filed his opposition to that motion, Flaherty submitted a 105-paragraph affidavit that he had executed on December 28, 2017.  Entergy has moved to strike various portions of that affidavit on the grounds that (1) some of the statements directly contradict his sworn testimony, (2) some contradict or characterize documents that speak for themselves, (3) some are merely conclusory statements, (4) some are contain hearsay, and (5) some are not based on his personal knowledge.  Because the outcome of summary judgment turns in part on the motion to strike, the Court will address that motion first.

## A.    Contradictory Statements

Entergy has moved to strike 14 statements that it contends contradict Flaherty's sworn

deposition testimony.  When "a party has given 'clear answers to unambiguous questions' in

discovery, that party cannot 'create a conflict and resist summary judgment with an affidavit that

is clearly contradictory.'"  *Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 54 (1st

Cir. 2000) (quoting *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d, 4-5 (1st Cir. 1994)).

However, such an affidavit may be accepted if the party provides a "satisfactory explanation of

why the testimony [has] changed."  *Id.* (alteration in original).  "Whether there is a contradiction

and whether the explanation for it is satisfactory are both likely to depend very much on an

assessment of specific facts."  *Id.*  Lapses in memory or new sources of information may be

acceptable explanations for a revision in testimony.  *Id.*

Here, Entergy seeks to strike the following statements from Flaherty's affidavit on the

ground that they contradict his sworn deposition testimony:

Paragraph 29:  In May, 2014, I fully disclosed my PTSD diagnosis to Entergy
when I requested a medical leave due to an elevated level of PTSD symptoms
which I felt might impair my ability to safely perform my duties.

Paragraph 37:  Given that I had already disclosed his [sic] diagnosis of PTSD to
Entergy's Human Resources Department who I understood had shared it with
Access Authorization, I also discussed my PTSD as well as my CFS diagnoses
with Entergy's medical and psychological evaluator.

Paragraph 58:  I fully disclosed my military combat history, and my CFS and
PTSD diagnoses and symptoms, to Dr. Peters and gave Dr. Peters full
authorization to my medical records and history.

Paragraph 66:  In the course of my report to the ethics hotline, although I had
previously disclosed my CFS and PTSD diagnoses to Entergy's medical and
psychological evaluators, to Human Resources (both of whom would necessarily
have shared them with the Access Authorization Department), that my
supervisors may not be aware of the diagnosis.

Paragraph 69: During the meeting with Dr. Boyd, I again disclosed my PTSD and CFS diagnoses as I had previously done on multiple occasions.

Paragraph 72: Dr. Boyd's May 1, 2015 report is not accurate in that it states that I had not previously disclosed my medical conditions of CFS and PTSD; in fact, as described herein, I had disclosed my medical conditions to Entergy's Human Resources Department in May and July 2014, to Entergy's psychological evaluator in July, 2014, and to Entergy's psychological evaluator in March, 2015.

Paragraph 74: Although I was aware of my symptoms of what I now understand to be CFS and PTSD, I was not aware of the actual CFS and PTSD diagnoses made by my medical providers until November, 2013, after the 2013 annual medical exam.

Paragraph 75: I did fully and in depth discuss and disclose my CFS and PTSD diagnoses to Entergy's medical evaluator during my July 2014 evaluation and during my full, five year examination and evaluation, which were the only medical exams that I recall occurring after November, 2013, when I became aware of the actual diagnoses.

Paragraph 88: I testified in my deposition incorrectly that he [sic] was diagnosed with PTSD in July, 2012.

Paragraph 89: In fact, as borne out by my medical records and VA Rating decision of October, 2013, I applied for VA service connected benefits due to symptoms in July 2012 but was not made aware of my diagnoses of CFS and PTSD until I received the VA's October 22, 2013 decision, in November, 2013.

Paragraph 93: I understood the deposition question "In fact, Mr. Flaherty, you never told anyone you had chronic fatigue until April 29, 2015, correct?" to be within the context of any request I made for accommodations, which was the topic of the line of questions during that portion of my deposition.

Paragraph 94: I understood the deposition question "In fact, Mr. Flaherty, you never told anyone you had chronic fatigue until April 29, 2015, correct?" to be asking whether I told any of my supervisors at Entergy about my CFS diagnosis before April 29, 2015.

Paragraph 96: I had in fact disclosed the CFS and PTSD diagnoses I received in November 2013 to Entergy's Human Resources Department in May 2014, to Entergy's medical examiner in July 2014 and to Entergy's medical examiner in March 2015.

Paragraph 99: I do not recall when I began to take Prazosin—I may or may not have been prescribed it as early as 2013 for symptoms I was describing to my

doctors which are associated with what I now understand to be PTSD; I was not made aware of an actual diagnosis of PTSD until November, 2013.

Those paragraphs can be subdivided into two broad categories. Paragraphs 29, 37, 58, 66, 69, 72, 75, 93, 94, and 96 all claim in substance that Flaherty disclosed both the diagnoses of PTSD and CFS to Entergy in May and July 2014, approximately one year before his termination. Paragraphs 74, 88, 89, and 99 all claim in substance that Flaherty was unaware of his PTSD and CFS diagnoses until November 2013.

### 1. The Claim That Flaherty Disclosed His PTSD and CFS to Entergy in 2014

The first category of statements concerns Flaherty's claimed disclosure of his PTSD and CFS. The claimed disclosure of the two conditions is different, and requires separate analysis.

In his deposition, Flaherty was asked, "[w]hen did you first inform Entergy of your diagnosis of PTSD?" He answered, "[t]he day that I showed Mr. Daly my VA disability claim paperwork," which was April 29, 2015. (Flaherty Dep. at 96-97). In his affidavit, however, he contends that he disclosed the diagnosis of PTSD in May 2014 (when he applied for FMLA leave), July 2014 (when he was evaluated to return), and in March 2015 (when he was evaluated by Peters). Those statements directly, and unquestionably, contradict his deposition testimony.

Flaherty's affidavit does not provide *any* explanation, let alone a satisfactory one, as to why his affidavit as to his disclosure of PTSD differs from his deposition. That fact, standing alone, is a sufficient basis to grant the motion to strike. Nonetheless, there is independent evidence that Flaherty's VA psychologist, Julie Klunk-Gillis, submitted a form to Entergy in May 2014 stating that Flaherty "is diagnosed with PTSD." It is a reasonable inference that the topic of PTSD was also raised to some extent when Flaherty requested a return from leave in July 2014. Accordingly, and notwithstanding the lack of a satisfactory explanation for the

change in memory, the Court will not strike those portions of the affidavit that indicate Flaherty disclosed his PTSD to the human resources department of Entergy in May and July 2014. Because the purported disclosure to Peters occurred after Flaherty was suspended, it is immaterial, and the Court need not resolve the issue.

The circumstances as to Flaherty's disclosure of his CFS are different. When asked in his deposition, "[i]n fact, you never told anyone you had chronic fatigue until April 29th, 2015, correct?" he answered, "[t]hat's correct." (*Id.* at 75). He now contends that he disclosed the existence of his CFS in July 2014 (when he was cleared to return from FMLA leave) and in March 2015 (with Peters). Notably, his affidavit does *not* state that he disclosed his CFS diagnosis when he *applied* for leave in May 2014.

Flaherty's affidavit includes a purported explanation for the contradiction in testimony as to his CFS disclosure. He gives two reasons for the change: first, that he understood the question "to be within the context of any request I made for accommodations, which was the topic of the line of questions during that portion of my deposition" (Flaherty Aff. ¶ 93); and second, that he understood the question "to be asking whether I told any of my supervisors at Entergy about my CFS diagnosis before April 29, 2015" (*Id.* ¶ 94). That explanation, however, is not sufficiently satisfactory to permit denial of the motion to strike.

First, the question at issue—"In fact, you never told anyone you had chronic fatigue until April 29, 2015, correct?"—was clear and direct. Nothing about it was confusing or ambiguous.

Second, Flaherty gives two different explanations for the change: he claims both that he interpreted the question to be asking about a request for accommodation and to be asking about communications with his supervisors. It is unclear whether he intends those explanations to be alternative, cumulative, or both. Notably, neither the word "accommodation" or "supervisors"

appears in the question.

Third, there is no evidence of any kind corroborating Flaherty's claim that he disclosed his CFS in 2014. The note from Klunk-Gillis in May 2014 refers to "PTSD," not "PTSD and CFS." (Pl. Ex. 4 at 10). Both are serious conditions that bear directly on his ability to hold a position as a nuclear security guard; surely it was not a mere oversight that CFS was not mentioned.

Fourth, Flaherty does not even claim that he disclosed his CFS when he applied for the leave in May 2014, only when he was cleared to return in July 2014. But that presents an unlikely and barely credible scenario in which he failed to disclose the condition when he was seeking leave, but then did disclose it (for no apparent reason) when he sought to return.

Fifth, the question of when Flaherty disclosed his CFS to Entergy is one of the central issues, if not the central issue, in the case. The investigation of Flaherty in April 2015 was triggered by his claim of fatigue, not PTSD (or diarrhea or back pain). (Keith Decl. Ex. 2 at 80; Beabout Dep. at 17, 42-43). The Access Authorization department obtained his medical records and immediately concluded that he had not disclosed his CFS—the condition causing his fatigue. Dr. Bond and Dr. Baker then concluded that he had not been honest. He was terminated, after an investigation, based on his lack of trustworthiness and reliability. The timing of the disclosure of CFS was thus not a collateral issue as to which a lapse in memory might be overlooked.

Sixth, and despite Flaherty's efforts to blur the distinction between PTSD and CFS (*see* Flaherty Aff. ¶ 103), they are separate diagnoses. Flaherty was taking medication for PTSD, and it is at least conceivable that he could have been accommodated on the job with such a condition. But he was not taking medication to treat CFS (in all likelihood, because CFS is notoriously difficult to treat and there is no known cure), and it is highly unlikely that any accommodation

was possible.  *See Chronic Fatigue Syndrome*, Mayo Clinic, *available at*

https://www.mayoclinic.org/diseases-conditions/chronic-fatigue-syndrome/diagnosis-

treatment/drc-20360510.  Flaherty thus had a powerful motive to conceal his diagnosis of CFS,

as there was a strong likelihood that disclosure would result in the loss of his job.

In short, the Court does not find Flaherty's explanation for submitting an affidavit that

contradicts his sworn deposition testimony to be satisfactory.  It will therefore strike the

references in Flaherty's affidavit that he disclosed his CFS to Entergy prior to April 29, 2015.

Accordingly, the motion to strike will be granted as to paragraphs 29, 37, 58, 66, 69, 72, 75, 93,

94, and 96, to the extent they refer to CFS.

### 2.    The Claim That Flaherty Did Not Receive a Diagnosis until 2013

The next category of statements concerns Flaherty's claim as to when he was diagnosed

with PTSD and CFS.  In his deposition, when asked, "when were you first formally diagnosed by

a medical professional with PTSD and chronic fatigue syndrome?" he answered, "[i]t was around

the middle of 2012, June or July, when I was going to all my doctors['] appointments for the

claim that I put in."  (Flaherty Dep. at 98).[8]

Both parties have submitted a copy of the VA letter granting Flaherty's claim for

disability payments on October 22, 2013.  (Keith Decl. Ex. 2 at 105).  Flaherty appears to claim

that the VA's decision constituted his formal diagnosis.  But VA rating decisions are clearly not

medical diagnoses—rather, they are eligibility decisions based on diagnoses made by physicians.

*See Miller v. Comm'r of Soc. Security*, 2018 WL 1357442, at *5 (S.D. Ohio Mar. 16, 2018)

("The VA Disability Rating System is diagnosis-driven and percentages are assigned *based on*

---

[8] Similarly, in his MCAD charge, plaintiff stated that he was "rated with chronic fatigue syndrome by [the VA] in 2012."  (Keith Decl. Ex. 2 at 102 ¶ 4).

*diagnoses* and certain specific objective or clinical findings.") (emphasis added). Therefore, for the VA to grant his disability claim, Flaherty presumably must have been diagnosed with PTSD and CFS at some point before October 22, 2013.

Flaherty contends that "there is nothing in the record contradicting [his] affidavit that he was not given a definitive, formal, physician's diagnoses of these conditions until he received the October 22, 2013 VA rating decision." It is true that the evidentiary record does not include a date of a formal diagnosis. However, the burden is on Flaherty to offer a "satisfactory explanation" as to why his testimony has changed, and whenever the diagnosis was made, it was certainly made before October 22, 2013.

Under the circumstances, the Court concludes that Flaherty has not offered a satisfactory explanation for his change in testimony with respect to statements about when he informed Entergy of his diagnoses. Accordingly, the motion to strike will be granted as to paragraphs 74, 88, 89, and 99 in their entirety.

### B.    Alleged Inaccurate Statements

Entergy also seeks to strike the following statements from Flaherty's affidavit as inaccurate representations of documents that speak for themselves:

> Paragraph 14:  The VA did not issue me a diagnosis of CFS or a VA rating of disability for my condition until October 22, 2013.

> Paragraph 15:  I received the VA rating decision and diagnosis in November, 2013.

> Paragraph 21:  The VA did not issue me a diagnosis of PTSD or a VA rating of disability for this condition until October 22, 2013.

> Paragraph 22:  I received the VA rating decision and diagnoses determination in November, 2013.

> Paragraph 65:  In response, I made a complaint to Entergy's ethics hotline, reporting that I had self reported fatigue as per Entergy's policy, that Entergy

failed to conduct a Fatigue Assessment per its policy, and instead issued me a 3 day suspension as discipline.

Paragraph 73: Dr. Boyd's report is also inaccurate in its contention that I did not disclose my CFS and PTSD diagnosis in annual medical exams.

Paragraph 104: When I discussed my FMLA leave with Entergy's Human Resources Department, I discussed both PTSD and CFS.

First, Entergy contends that the word "diagnosis" in paragraphs 14, 15, 21, and 22 should be struck because the October 22, 2013 VA rating decision did not constitute a diagnosis. For the reasons set forth above, the Court agrees that Flaherty must have been diagnosed before October 22, 2013, and will strike references to "diagnosis" from those four paragraphs.

Second, Entergy argues that paragraph 65 misrepresents Flaherty's April 24, 2015 ethics hotline complaint, because the case detail report made no mention of failure to conduct a "Fatigue Assessment." However, the case detail report was merely a summary of the verbal complaint made by Flaherty, so it is possible that Entergy's case investigator simply omitted it. In addition, the case detail report was prepared by an Entergy employee, not by Flaherty. Therefore, paragraph 65 will not be struck.

Third, Entergy contends that paragraph 73 should be struck because there is no evidence that Flaherty disclosed his diagnoses in his annual medical history questionnaires and medical examinations. It is undisputed that Flaherty failed to disclose either his PTSD or CFS in his 2012, 2013, and 2014 annual medical questionnaires. In addition, physician notes at the end of each questionnaire only state that Flaherty suffered from back pain. Accordingly, paragraph 73 will be struck.

Fourth, Entergy contends that any mention of CFS should be struck from paragraph 104 because Flaherty's FMLA paperwork submitted to Entergy's human resources department did not mention CFS. The paragraph will be struck, not because it contradicts the paperwork, but

because it impermissibly contradicts Flaherty's deposition testimony, as set forth above.

### C.    Alleged Conclusory Statements

Next, Entergy seeks to strike two paragraphs that it contends constitute argument

and conclusory statements:

> Paragraph 60:  I cooperated with Dr. Peters fully and answered all of his questions completely and truthfully.

> Paragraph 76:  The May 2015 report of Entergy's psychological examiner Lawrence Baker is false and inaccurate in many ways.

The Court agrees that paragraph 76 reflects opinion and argument rather than admissible facts.

Accordingly, that paragraph will be struck.  However, to the extent paragraph 60 reflects

Flaherty's understanding of his discussion with Dr. Peters, it is admissible.

### D.    Alleged Hearsay

Entergy also seeks to strike two paragraphs that it contends rely on inadmissible hearsay:

> Paragraph 59:  Dr. Peters and I discussed my CFS and PTSD conditions and symptoms at great length.

> Paragraph 97:  Entergy's Human Resources representative had informed me that Entergy's Access Authorization department would be notified of my diagnoses, but that my supervisors would not be so notified.

Flaherty contends that paragraph 59 is offered not for the truth of the matter asserted, but

rather as proof that Entergy was aware of his diagnoses.  On that basis, paragraph 59 will not be

struck.  Paragraph 97 contains a statement by an opposing party and is therefore not hearsay, and

will not be struck on that basis.

### E.    Alleged Lack of Personal Knowledge

Finally, Entergy seeks to strike four paragraphs that it contends are not based on

Flaherty's personal knowledge:

> Paragraph 38:  Like my own medical providers, and with full knowledge of my

CFS and PTSD diagnoses, Entergy's medical and psychological evaluator assigned by Access Authorization determined that I was fit for duty and that I remained qualified for unescorted access to the Pilgrim facility.

Paragraph 40: I understood that the Questionnaire would be shared with my supervisors, not necessarily with Access Authorization, who I understood had already been made aware of my CFS and PTSD diagnoses by Human Resources and Entergy's medical and psychological evaluator who had just evaluated me for unescorted access in the same month (July 2014).

Paragraph 53: I believed that Entergy's failure to conduct a Fatigue Assessment on I [sic] was a breach of Entergy's Fatigue Assessment Policy.

Paragraph 105: CFS is a diagnosis also known as fibromyalgia or myalgia; my doctors use these terms interchangeably.

It is unclear exactly which evaluator paragraph 38 is referring to. It could refer to nurse practitioner Sheila Shea, who approved Flaherty's return from medical leave in July 2014. Alternatively, it could refer to George Peters, who Flaherty contends found him fit for Unescorted Access Authorization in March 2015. Either way, Entergy contends that this paragraph should be struck because the statement "is purely speculative and [Flaherty] has not provided any documents to show he had personal knowledge of what Entergy's medical and psychological evaluator knew or didn't know." (Def. Mem. in Supp. of Mot. to Strike at 14). As set forth above, Flaherty has not provided any evidence that he disclosed his CFS to Entergy or its medical evaluators prior to March or April 2015. Accordingly, to the extent it addresses CFS, paragraph 38 will be struck.

Entergy contends that paragraph 40 should be struck because it is based on Flaherty's "beliefs and understanding." (*Id.*). However, in the context of Flaherty's affidavit, it appears paragraph 40 is referring to certain "representations" made by Entergy's human resources staff. Therefore, the statement is based on personal knowledge and is admissible.

Paragraph 53, which states that Flaherty believed Entergy breached its own policy, is a

legal conclusion. Accordingly, that paragraph will be struck.

Finally, Entergy argues that paragraph 105 concerns medical information as to which Flaherty is not qualified to opine. Flaherty is not a trained medical professional and is unqualified to offer an opinion on this matter.[9] Therefore, paragraph 105 will also be struck.

## III.    <u>Analysis – Motion for Summary Judgment</u>

### A.    <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but

---

[9] Some cases have suggested that fibromyalgia (or myalgia) and CFS are related, but distinct diagnoses. *See Cook v. Liberty Life Assur. Co. of Boston,* 320 F.3d 11, 15 n.4 (1st Cir. 2003) ("Fibromyalgia is a disorder characterized by widespread musculoskeletal pain, fatigue and multiple tender points."); *Lamanna v. Special Agents Mut. Benefits Ass'n,* 546 F. Supp. 2d 261, 270 n.8 (W.D Pa. 2008) ("Chronic fatigue syndrome, also known as immune dysfunction syndrome, is a condition of prolonged and severe fatigue which is not relieved by rest and is not directly caused by other conditions.").

instead must "present affirmative evidence." *Id.* at 256-57.

As noted, the complaint brings two claims—Count One alleges disability discrimination and failure to accommodate in violation of the ADA, and Count Two alleges disability discrimination and failure to accommodate in violation of the Massachusetts Antidiscrimination Statute, Mass. Gen. Laws ch. 151B. Because the Massachusetts Antidiscrimination Statute is analogous to the ADA and is generally construed the same as federal law, the claims will be addressed in tandem. *See Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 816 n.5 (1997).

## B. Disability Discrimination

To establish disability discrimination, a plaintiff must prove that he "(1) was disabled within the meaning of the ADA [and Chapter 151B], (2) was able to perform the essential functions of the job with or without reasonable accommodation, and (3) was discharged by the employer in whole or in part because of his disability." *Rosado v. Wackenhut Puerto Rico, Inc.*, 160 Fed. Appx. 5, 10 (1st Cir. 2010).[10] He may prove the third element, discriminatory discharge, through direct or indirect evidence. *See id.*

Where, as here, no direct evidence of discriminatory animus and causation exists, a plaintiff may establish the necessary elements by circumstantial evidence using the three-stage burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71-72 (1st Cir. 2004). Under that framework, a plaintiff must first establish a *prima facie* case of discrimination. *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001). Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer articulates such a reason, the burden shifts

---

[10] The parties do not dispute that PTSD and chronic fatigue syndrome are "disabilities" within the meaning of the ADA and Massachusetts Antidiscrimination Statute.

back to the plaintiff to show that the proffered reason was mere pretext, and that the true reason was unlawful discrimination. *Id.* at 34. Thus, "[a]t the summary judgment stage, the plaintiff must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was . . . discrimination." *Quinones v. Buick*, 436 F.3d 284, 289-90 (1st Cir. 2006) (citation and quotation marks omitted).

### 1. *Prima Facie* Analysis

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that

> (1) he or she is a member of a protected class; (2) possessed the necessary qualifications and adequately performed his or her job; (3) was nevertheless dismissed or otherwise suffered an adverse employment action at the hands of his or her employer; and (4) his or her employer sought someone of roughly equivalent qualifications to perform substantially the same work.

*Aly v. Mohegan Council, Boy Scouts of Am.*, 711 F.3d 34, 46 (1st Cir. 2013).

The crux of the parties' dispute is over the second element. Entergy contends that Flaherty was fired because he failed to disclose his medical condition for years, at least until April 2015. In support, Entergy highlights the fact that Flaherty filled out three annual medical questionnaires between 2012 and 2014 and did not disclose his PTSD or CFS or any medication he was taking. (Mem. in Supp. at 16 n.5). He was diagnosed with both PTSD and CFS in mid-2012, and never disclosed his CFS to his supervisors, Entergy's medical evaluators, or anyone else affiliated with the company, despite his clear obligation to do so and multiple opportunities and reminders. By concealing his diagnosis—which undoubtedly impacted his ability to work as a security guard—Flaherty violated NRC regulations requiring that nuclear plant security personnel demonstrate trustworthiness and reliability. *See* 10 C.F.R. § 50.5(a)(2). Entergy was

well within its rights to strip him of his Unescorted Access Authorization.  Without the Unescorted Access Authorization, he lacked the "necessary qualifications" to perform his job. *See McNelis v. Penn. Power & Light Co.*, 867 F.3d 411, 415 (3d Cir. 2017) (finding that failure to maintain access authorization constituted inability to perform the essential functions of employee's position).  Accordingly, he was "unqualified under the ADA as a matter of law." *Silver v. Entergy Nuclear Ops., Inc.*, 290 F. Supp. 3d 234, 246 (S.D.N.Y. 2017).[11]

Flaherty contends that his Unescorted Access Authorization was wrongfully revoked.  In his opposition memorandum, he states that Entergy's reliance on Drs. Boyd and Baker's reports was "unreasonable and misplaced" because he had disclosed his PTSD and CFS earlier.  (Mem. in Opp. at 18).  As explained above, he has offered some evidence that Entergy's human resources department and "Leave Team" were notified of his PTSD in May 2014, nine months before he cited fatigue in declining to work mandatory overtime.  (Pls. Ex. 4, 5).  But he has offered no evidence that Entergy was aware of his CFS, other than his own contradictory affidavit, the relevant portions of which have been stuck.  There is, accordingly, no evidence that his Unescorted Access Authorization was improperly revoked based on his failure to disclose his CFS.  Flaherty has thus failed to make a *prima facie* showing of discrimination, warranting summary judgment as to the discrimination claims.

### 2.    Entergy's Stated Reason for Termination Was Not Pretextual

Furthermore, and in any event, Entergy has offered a legitimate, non-discriminatory reason for its decision to terminate Flaherty, and he has failed to show that the stated reason for termination was pretextual.  Flaherty did not disclose his CFS to anyone at Entergy until

---

[11] "The denial of UAA renders an individual unqualified where, as here, UAA is an essential function of the job, regardless of whether the individual bringing the claim asserts he is actually disabled or regarded as disabled by his employer."  *Silver*, 290 F. Supp. 3d at 246.

February 2015, despite the condition's high likelihood of adversely impacting his ability to serve as a security officer at a nuclear power plant. (Beabout Dep. at 14-15, 17). After learning of the CFS, his supervisors initiated an investigation. (Keith Decl. Ex. 2 at 80-81). The Access Authorization department concluded that he had never informed Entergy of his CFS. (Colburn Aff. ¶¶ 23-25). After he was evaluated by Drs. Baker and Boyd, Entergy concluded that he had not been forthcoming about his CFS and revoked his Unescorted Access Authorization. (*Id.* Exs. L, M). Without that authorization, he could no longer work as a security officer and was terminated. (*Id.* Ex. N).

Flaherty has offered no admissible evidence in support of his contention that his termination was pretextual. His opposition memorandum solely relies on his affidavit's claims that he disclosed the CFS diagnosis in mid-2014. (Mem. in Opp. at 22). However, those statements have been struck. Accordingly, the motion for summary judgment will be granted as to Count One.

### C. <u>Failure to Accommodate</u>

#### 1. <u>Whether Accommodation Was Possible</u>

Flaherty further contends that Entergy failed to accommodate his disability. At the summary judgment stage, a plaintiff "must produce enough evidence for a reasonable jury to find that (1) he is disabled within the meaning of the ADA, (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [his employer], despite knowing of [his] disability, did not reasonably accommodate it." *Rocafort v. IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003).

In his opposition, Flaherty relies on two arguments. First, he reiterates his earlier contention that Entergy was aware of both his PTSD and CFS diagnoses, and cleared him to

return to work after his FMLA leave.  However, he has not provided any evidence to show that Entergy was informed of his CFS.

Second, and more importantly, Flaherty contends that he did not "constitute an unreasonable risk to the public health and safety or the common defense and security, including the potential to commit radiological sabotage."  (Mem. in Opp. at 25).  He alleges that the PTSD and CFS did not interfere with his ability to serve as a security officer.  This argument is unavailing for multiple reasons.

As described above, Entergy revoked his Unescorted Access Authorization for lack of trustworthiness, based (at a minimum) on his failure to disclose his CFS diagnosis.  That authorization was an essential requirement to his job, and thus he was categorically barred from continuing as a security officer, even if an accommodation was possible.

In addition, the VA had already determined Flaherty was 70% disabled by July 5, 2012. (Keith Decl. Ex. 2 at 140).  That disability rating later increased to 90% on November 25, 2015, and 100% on January 6, 2017.  (*Id.* at 126, 140).  Flaherty has not posited, and the Court is unaware of, any reasonable accommodation that would allow an individual who is substantially disabled by both PTSD and CFS to guard a nuclear reactor while carrying a firearm.

Finally, Flaherty is wholly unqualified to substitute his own opinion and judgment in place of qualified professionals to determine whether he was fit for duty.  *See* 10 C.F.R. § 73, App. B(2)(b) ("A licensed psychologist, psychiatrist, or physician trained in part to identify emotional instability shall determine whether armed members of the security organization . . . have no emotional instability that would interfere with the effective performance of assigned duties and responsibilities.").  It is generally not the place of courts, let alone lay persons, to question the judgment of informed medical professionals.  *See Murphy v. United Parcel Serv.,*

*Inc.*, 527 U.S. 516, 522 (1999) ("Had a physician examined petitioner . . . we would not second-guess that decision."). And after Drs. Baker and Boyd had rendered their opinions, both parties were barred from seeking a second determination. *See* 10 C.F.R. § 26.189(d) ("Neither the individual nor licensees . . . may seek a second determination of fitness if a determination of fitness . . . has already been performed by a qualified professional.").

To the extent Flaherty's failure-to-accommodate claims arise out of Entergy's purported failure "to engage in an interactive process," that argument must also fail. "[L]iability for failure to engage in an interactive process 'depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions.'" *Jones v. Nationwide Life Ins. Co.*¸696 F.3d 78, 91 (1st Cir. 2012) (quoting *Kvorjak v. Maine*, 259 F.3d 48, 52 (1st Cir. 2001)). Perhaps if Flaherty had timely disclosed his diagnoses, the parties could have developed an accommodation. However, by concealing a condition that was likely to materially impact his ability to work as a security officer, he lost his Unescorted Access Authorization, making it impossible to perform the essential functions of his job. *See Jones v. Walgreen Co.*, 679 F.3d 9, 20 (1st Cir. 2012).

## 2.  Whether Plaintiff Administratively Exhausted His Claims

Summary judgment will be granted on Count Two as to the failure-to-accommodate claims because those claims were not administratively exhausted. "[T]he ADA mandates compliance with the administrative procedures specified in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and that, absent special circumstances, . . . , such compliance must occur before a federal court may entertain a suit that seeks recovery for an alleged violation of Title I of the ADA." *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 (1st Cir. 1999); *see*

*also Rivera-Diaz v. Humana Ins. of P.R., Inc.*, 748 F.3d 387, 389 (1st Cir. 2014) ("Claims of employment discrimination and retaliation under the ADA are subject to the procedural requirements of Title VII.").

Title VII requires that before filing suit, a plaintiff must file a claim with the EEOC "'within one hundred and eighty days after the alleged unlawful employment practice occurred' or within 300 days if 'the person aggrieved has initially instituted proceedings with [an authorized] state or local agency,'" in this case the MCAD. *Bonilla*, 194 F.3d at 278 (quoting 42 U.S.C. § 2000e-5(e)). The employee may sue in federal court only if the EEOC or MCAD dismisses the administrative charge, or if he does not bring civil suit or enter into a conciliation agreement within 180 days of the filing of the administrative charge. 42 U.S.C. § 2000e-5(f)(1); *see also Franceschi v. U.S. Dep't of Veterans Affairs*, 514 F.3d 81, 85 (1st Cir. 2008). "In either case, the EEOC must send the employee notice, in the form of what is known as a right-to-sue letter." *Franceschi*, 514 F.3d at 85; *see also Goldstein v. Brigham & Women's Faulkner Hosp., Inc.*, 80 F. Supp. 3d 317, 323-24 (D. Mass. 2015) ("[A] plaintiff cannot file a federal claim until she has received a notice of right-to-sue from the EEOC, which is provided upon dismissal by the EEOC or at the request of the plaintiff after the EEOC has had the complaint for 180 days.").[12]

The administrative-exhaustion requirement extends to claims under Mass. Gen. Laws ch. 151B. *See Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir. 1996) ("Both Title VII and Chapter 151B require an employee to file an administrative charge as a prerequisite to commencing a civil action for employment discrimination."). Because "[t]hat purpose would be frustrated if the employee were permitted to allege one thing in the administrative charge and

---

[12] The parties have not submitted the right-to-sue letter. However, there is a letter from plaintiff's counsel addressed to the EEOC requesting a right-to-sue letter. (Keith Decl. Ex. 2 at 95).

later allege something entirely different in a subsequent civil action[,]" "in employment discrimination cases, '[t]he scope of the civil complaint is . . . limited by the charge filed with the [MCAD] and the investigation which can reasonably be expected to grow out of that charge.'" *Id.* (quoting *Powers v. Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir. 1990)).

The MCAD charge filed by Flaherty says nothing whatsoever about any failure to accommodate; it solely alleges discrimination on the basis of disability. Even allowing for reasonable inferences, there is no basis to construe the MCAD charge as including an allegation of a failure to accommodate.

Flaherty contends that because he cited Mass. Gen. Laws ch. 151B, § 4(16) in his MCAD charge, Entergy was provided sufficient notice of his failure to accommodate claims. That argument is unavailing. A threadbare recitation to a broad statutory provision does not support the conclusion that the MCAD charge included allegations of failure to accommodate, particularly where the charge specified that Flaherty "was discriminated against by [Entergy] on the basis of Disability" and "charge[d] the Respondent with discrimination on the basis of disability." (Keith Decl. Ex. 2 at 102-03). To the extent Flaherty relies on the fact that he was proceeding *pro se* when he filed the MCAD charge, even *pro se* litigants must comply with procedural and substantive law. *See Cummings v. Pearson Educ., Inc.*, 2006 WL 151880, at *2 (D. Mass. Jan. 18, 2006) (citing *Lefebvre v. Comm'r of Internal Revenue Serv.*, 830 F.2d 417, 419 (1st Cir. 1987)).

Because the failure to accommodate claims are beyond the scope of the MCAD charge, Flaherty "failed to fulfill the exhaustion requirement necessary to maintain his Title VII and Chapter 151B [failure to accommodate] claims." *Camarck v. Nat'l R.R. Passenger Corp.*, 486 F. Supp. 2d 58, 97 (D. Mass. 2007). Accordingly, summary judgment will be granted as to Count

Two.

## V.  **Conclusion**

For the foregoing reasons, the motion of defendant Entergy Nuclear Operations, Inc. to strike is GRANTED in part and DENIED in part, and the motion for summary judgment is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor

F. Dennis Saylor IV

United States District Judge

Dated:  July 9, 2018